**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOMITILA LEMUS, ) | Case No. 07-cv-01773 -TAG |
| ) | |
| Plaintiff, ) | MEMORANDUM DECISION AND ORDER |
| ) | ON PLAINTIFF'S APPEAL FROM |
| v. ) | ADMINISTRATIVE DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | ORDER REMANDING CASE PURSUANT TO |
| Commissioner of Social Security, ) | SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| ) | |
| Defendant. ) | ORDER DIRECTING CLERK TO ENTER |
| ) | JUDGMENT IN FAVOR OF PLAINTIFF AND |
| _____ ) | AGAINST DEFENDANT |

Plaintiff Domitila Lemus ("Plaintiff") seeks judicial review of the final administrative decision denying her concurrent applications for disability insurance benefits ("disability benefits") and for widow's insurance benefits under Title II and Title XVIII, Part A, 42 U.S.C. §§ 401 *et seq.* and §§ 1395c *et seq.* of the Social Security Act ("the Act"). Plaintiff filed her complaint on December 5, 2007. (Doc. 1). The matter has been fully briefed by the parties. (Docs. 15, 17, 18).

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to proceed before a United States Magistrate Judge for all further proceedings in this case, including trial and entry of final judgment. (Docs. 3, 8). By order dated January 15, 2008 and docketed January 16, 2008, this action was assigned to the United States Magistrate Judge for all further proceedings. (Doc. 9).

## INTRODUCTION

On October 14, 2002, Plaintiff, then a 53-year-old widow and field laborer, was working in an orchard in the Central Valley of California, picking olives. The tree she was picking gave way

1

and she fell from the ladder on which she had been standing, hitting the ground about ten feet below. The right side of Plaintiff's body sustained the impact, resulting in injuries to her ribs, back, upper right extremity and her neck. Plaintiff reported that she lost consciousness for a brief period of time. Supervisors immediately responded and took Plaintiff for medical attention to a local clinic. As a result of injuries sustained during that fall, Plaintiff did not return to work.

After brief treatment from generalists at the local health care clinic that did not relieve her continuing discomfort, Plaintiff chose to be treated primarily through the complementary and alternative health care services of a chiropractor, Dr. Ronald Ybarra. From the documentation and treatment provided to Plaintiff, it appears that Dr. Ybarra possessed a chiropractic degree, was licensed to practice in California, and was a fellow of the Academy of Forensic and Industrial Chiropractic Consultants.[1] He was also a state appointed Qualified Medical Evaluator[2] as well as a Certified Industrial Disability Evaluator.

Plaintiff's first contact with Dr. Ybarra came two months after the accident and continued regularly thereafter throughout the pendency of the administrative proceedings in this matter. After initially examining Plaintiff in December of 2002, Dr. Ybarra began a treatment program of chiropractic manipulative treatments and physical therapy one to three times per week for the next four to six weeks. Through mid-to-late fall of 2003, Plaintiff continued to see Dr. Ybarra for treatment and evaluation about once each week, if not more frequently. After that, her chiropractic treatment with Dr. Ybarra occurred once or twice a month. By early July 2007, Dr. Ybarra had seen and treated Plaintiff on approximately 75 occasions.

---

[1] This information is published in, or can be derived from, his written Permanent and Stationary Report to the State Compensation Insurance Fund dated June 19, 2003. (AR 271-276).

[2] According to the California Department of Industrial Relations, "[q]ualified medical evaluators (QMEs) are qualified physicians certified by the Division of Workers' Compensation - Medical Unit to examine injured workers to evaluate disability and write medical-legal reports. The reports are used to determine an injured worker's eligibility for workers' compensation benefits. QMEs include medical doctors, doctors of osteopathy, doctors of chiropractic, dentists, optometrists, podiatrists, psychologists and acupuncturists." California Department of Industrial Relations http://www.dir.ca.gov/dwc/MedicalUnit/QME_page.html (last visited March 23, 2009). The Department further explains that "A qualified medical evaluator (QME is a physician who evaluates [an injured worker] when there are questions about what benefits [the injured worker] should receive. A physician must meet educational and licensing requirements to qualify as a QME. They must also pass a test and participate in ongoing education on the workers' compensation evaluation process." (*Id.* at http://www.dir.ca.gov/dwc/medicalunit/faqiw.html#3) (last visited March 23, 2009).

Plaintiff filed a worker's compensation claim for disability benefits with California's State Compensation Insurance Fund. As her treating physician and a Qualified Medical Evaluator, Dr. Ybarra prepared a Permanent and Stationary Report dated June 19, 2003 for use in assessing Plaintiff's disability status by the State Compensation Insurance Fund claim's manager. A second medical evaluation dated September 2, 2003, done after an independent examination of Plaintiff in August of 2003, was prepared by Dr. Randy Willis, another doctor of chiropractic medicine and state appointed Qualified Medical Evaluator, for use in determining various workers' compensation issues, including that of the degree to which injuries resulted in permanent disability, if any. Both concluded Plaintiff was permanently disabled and to a substantial degree. The stipulated award, based on the evaluations and opinions of Drs. Ybarra and Willis, provided that the injuries sustained in Plaintiff's fall from the ladder in October of 2002 caused her to suffer a permanent disability of 55 ½% in her occupational abilities as a field laborer.

Before her workers' compensation claim was finally resolved, Plaintiff filed for disability insurance benefits and widow's insurance benefits under the Act. Plaintiff submitted these same medical evaluation reports of Drs. Ybarra and Willis as part of her proof of disability, along with a physical residual functional capacity assessment done by Dr. Ybarra after treating Plaintiff for nearly five years. In his initial decision, the Administrative Law Judge (ALJ) found these opinions and information of little use in adjudicating Plaintiff's disability claims under the Act, largely because chiropractors are not acceptable medical sources under the Act's regulatory rules. The Appeals Council suggested in its March 2007 remand order that more attention and consideration of these opinions was warranted than had been demonstrated in the ALJ's original written decision and sent the matter back. Among other things, Plaintiff argues in this case that the decision after remand remains impermissibly flawed mostly due to the ALJ's inadequate analysis and improper application of the law and regulations to the opinions of Drs. Ybarra and Willis, most especially Dr. Ybarra.

## **PROCEDURAL HISTORY**

Plaintiff filed her application for disability insurance benefits on April 19, 2004. (Administrative Record ("AR") 74, 156, 186) and her application for widow's insurance benefits on

April 15, 2005 (AR 438-440).  Plaintiff alleged a disability onset date of October 14, 2002 (AR 153) and claimed that injuries to her right side and lower back limited her ability to work (AR 190). Plaintiff said that these injuries rendered her unable to work because she could not stand, sit, or walk for very long due to pain.  (AR 190).  The Commissioner initially denied Plaintiff's application on August 27, 2004 (AR 106-110) and her subsequently filed request for reconsideration in December of 2004 (AR 112-116).

On January 14, 2005, Plaintiff filed a request for a hearing before an ALJ.  (AR 117). The hearing was conducted on September 18, 2006  and testimony was taken from Plaintiff and a vocational expert.  (AR 36-53).  Counsel represented Plaintiff at that hearing (*id*.) and at all other times throughout these proceedings since June 29, 2006.  (AR 34-35).

On October 19, 2006, the ALJ issued his written findings and orders in this matter, concluding that Plaintiff was not disabled and therefore not eligible for disability insurance benefits under the Act.  (AR 88-97, 97).  On or about December 7, 2006, Plaintiff requested the Appeals Council to review the ALJ's decision.  (AR 146).  The Appeals Council did so, vacating the initial hearing decision of October 19, 2006, and remanding the matter to the ALJ for resolution of certain issues in the manner described in the Appeals Council's order.  (AR 103-105).

Because of its importance to the Court's ruling in this case, some additional attention to the Appeals Council's remand order is appropriate.  That order indicated the sources of the ALJ's errors were several, i.e., the ALJ's failure to consider the opinions of the chiropractic practitioners properly with the Appeals Council referencing the policies and guidelines contained in Social Security Ruling 06-3p as instructive on this issue; the ALJ's apparent misunderstanding of the evidence from Dr. Ybarra, Plaintiff's chiropractor, on the issue of whether he opined that Plaintiff had been "cured"on July 31, 2003; the ALJ's failure to acknowledge or evaluate Plaintiff's apparent obesity or the effects that such an impairment might have on Plaintiff's ability to work, referencing another Social Security Ruling, No. 02-1p, on this issue; and the ALJ's apparently inadequate evaluation of Plaintiff's credibility regarding her subjective complaints.  (AR 103-104).

In reaching these conclusions, the Appeals Council pointed to a number of evidentiary matters that appear to have been critical to its analysis, including the following:

4

The Administrative Law Judge found that the claimant has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, and to stand, sit or walk 6 hours in an 8-hour workday. He concluded that the claimant was not disabled on the basis that she can perform her past work as a harvest worker.

The evidence of record includes opinions of chiropractors Willis and Ybarra (Exhibits 3F and 4F). Chiropractor Ybarra reported in connection with his June 2003 Permanent and Stationary Report that the claimant's problems with her neck preclude heavy lifting and prolonged neck flexion, and that her low back problems preclude "substantial work," heavy lifting, repetitive bending, and prolonged standing and sitting. (Exhibit 3F, p. 8.) Chiropractor Willis reported permanent work restrictions of no repetitive motions of the neck, no heavy lifting, and no "substantial work" (Exhibit 4F, pg. 30). He further reported that the claimant was unable to perform the ususal and customary duties of an olive picker (or the same job the Administrative Law Judge determined that the claimant retains the capacity to perform).

20 CFR 404.1527 explains how medical opinions from "acceptable medical sources" are evaluated. However, chiropractors are not considered acceptable medical sources (20 CFR 404.1513(d)). Yet, evidence from other sources can still be used to evaluate the severity of a person's impairments and needs to be addressed in accordance with the latter regulation and Social Security Ruling 06-3p. The Administrative Law Judge did state that chiropractor Ybarra discharged the clamant as cured on July 31, 2003, but he did not otherwise discuss or evaluate the information provided by him. Moreover, the reference cited by the Administrative Law Judge (or Exhibit 14F, pg. 33) did not confirm his statement that Dr. Ybarra discharged the clamant as cured. Rather, he determined that the claimant was permanent and stationary effective June 19, 2003 according to that citation.

(AR 103-104).

Among the other provisions of its order, the Appeals Council instructed that, upon remand for further hearing,

The Administrative Law Judge ... will obtain updated medical information from any treating sources. As appropriate, he will also obtain one or more consultative examinations regarding the claimant's condition. The Administrative Law Judge will consider the entire record, provide discussion and rationale for conclusions reached concerning the specific limitations resulting from the claimant's impairments. In addition, he will provide rationale regarding the weight he accords to the medical opinions/assessments in accordance with 20 CFR 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p. The credibility of claimant's subjective complaints will be addressed within the guidelines of 20 CFR 404.1529 and Social Security Ruling 96-7p.

(AR 104).

///

The remand hearing was held July 10, 2007 before the ALJ who had conducted the earlier hearing. (AR 36, 54-73). Plaintiff was again present and assisted by counsel as well as a Spanish language interpreter. (AR 36, 38). Plaintiff testified, as did vocational expert, Jose Chaparro. (AR 37). On July 20, 2007, the ALJ issued his written decision, again concluding that Plaintiff was not under a disability from and after October 14, 2002, the alleged onset date, and, therefore, not eligible for disability income benefits or widow's insurance benefits under the Act. (AR 27). On or about August 28, 2007, Plaintiff asked the Appeals Council to review this second decision (AR 12), which request was denied on October 15, 2007 (AR 7-9) because the Appeals Council found "no reason under our rules to review the Administrative Law Judge's decision." (*Id.*) The ALJ's decision became the Commissioner's final decision in the matter. Plaintiff timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision (made through the ALJ) when the determination is not based on legal error and is supported by substantial evidence. See *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services* , 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S.C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988.) And it "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the Court will consider the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989)

(quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the Court, to resolve conflicts in the evidence. *Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, one of which supports the Commissioner's decision, that decision must be upheld. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive (*Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987)) unless an improper standard was applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

Disability insurance benefits under Title II of the Act are available to individuals who have worked in recent years and who are determined to be disabled due to a physical and/or mental impairment. 42 U.S.C. §§ 401 *et seq.* In order to qualify, the person seeking disability benefits must demonstrate that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To be eligible for benefits for disability insurance benefits, a worker must, among other things, be insured for disability purposes and be disabled on that date. 42 U.S.C. § 416(i). 20 C.F.R. § 404.101(a) provides, in pertinent part, that an applicant's "insured status" is a basic factor in determining if someone is entitled to disability insurance benefits and that if the person seeking those benefits is neither fully nor currently insured, no benefits are payable.

The Commissioner uses a five-step sequential evaluation process for determining whether a person is disabled under Title II of the Act. 20 C.F.R. § 404.1520. Step one determines whether the

7

claimant is engaged in substantial gainful activities.  If he is, benefits are denied.  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments that meet the duration requirements,  i.e. the impairment(s) are expected to result in death, or have continuously lasted or are expected to last at least twelve months.  If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied.  If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is conclusively presumed to be disabled.  If the impairment does not, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past.  If the claimant is able to perform his previous work, he is not disabled.  If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience.  *See Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).

The initial burden of proof rests upon a claimant to establish that he "is entitled to the benefits claimed under the Act."  *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's *affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999)(italics in original).  The initial burden is met once a claimant establishes that a physical or mental impairment prevents her from engaging in her previous occupation.  The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

///

To be eligible for widow's insurance benefits, the claimant must prove, among other things, that she is the widow of an individual who was fully insured upon death. 42 U.S.C.A. 402(e); 20 C.F.R. 404.335(a). The claimant must also prove that she is at least 60 years old, or at least 50 years old and under a disability that started no later than seven years after the insured died or seven years after the claimant was last entitled to survivor's benefits based upon a disability, whichever occurred last. 42 U.S.C. § 402(e); 20 C.F.R. 404.335(c).

## RELEVANT FACTUAL INFORMATION

### A.    *Medical Evidence*

1.    <u>Diagnostic and Treatment Information</u>.    As noted earlier, Plaintiff was a 53-year-old widow engaged in her traditional job as a fruit harvest worker when she was hurt in an employment-related fall on October 14, 2002. (AR 248, 58-59). Plaintiff injured her lower back, neck, right ribs and right shoulder. (AR 59-60). She was immediately taken to Family Health Care Network, a local medical clinic and seen by Dr. Christopher Gillespie. (AR 248, 288). Plaintiff complained of pain around her right ribs and to her right side. (*Id.*) Dr. Gillespie ordered x-rays to assess for fractures and prescribed pain medication and cool compresses to affected area. (*Id.*) The x-ray findings were normal. (AR 246, 249). Plaintiff saw Dr. Gillespie several more times over the course of the next month and continued to complain of pain to her right side and ribs as well as her lower back, although she demonstrated some improvement with regard to the rib injury. (AR 242-248). Plaintiff's treatment was relatively conservative over the course of her care by Dr. Gillespie and he released her to return to work on November 16, 2002. (AR 242). However, Plaintiff continued to experience pain that left her feeling unable to work and, approximately one month later, Plaintiff consulted with Dr. Ronald Ybarra, a licensed chiropractor, for evaluation of her pain and treatment options. (AR 271).

Plaintiff's complaints at that time included persistent neck, low back, right shoulder, right arm, right leg, and right ribs injured as a result of the work-related accident. (*Id.*) Dr. Ybarra's physical examination of Plaintiff on that date showed positive orthopedic signs of injury as well as some negative indicators. (AR 272). Dr. Ybarra had x-rays done on that same date by radiologist, Mario Deguchi, M.D., of Plaintiff's right lower ribs, cervical spine, thoracic spine. (AR 356, 357,

358).  Diagnostic impressions showed a misalignment of right seventh rib, minimal degenerative disc disease of the cervical spine; degenerative disc disease at the thoracic spine level; S-shaped scoliosis of the thoracic/lumbar spine hypolordosis bordering on a lordosis of the cervical spine; and dextroconvex scoliosis of the cervical/thoracic spine.  (*Id.*)  Dr. Ybarra concluded that Plaintiff had suffered a moderate neuromusculo-skeletal ligamentous injury.  (AR 272).  Conservative chiropractic treatment of her condition began on December 17, 2002, with spinal manipulative therapy and physiotherapy.  (AR 253, 272).  For the first four to six weeks, Plaintiff was treated by Dr. Ybarra one to three times per week.  (AR 289).  From sometime in February 2003 through mid-to-late fall of that same year, Plaintiff continued to see Dr. Ybarra for treatment and evaluation about once each week, if not more frequently.  (AR 416-421).

Due to the persistent nature of Plaintiff's neck, shoulder and low back pain, Dr. Ybarra thought it advisable to consult with several other licensed medical doctors, Sanjay Chauhan, a neurologist, William Glenn, a radiologist, and G. B. Ha'Eri, an orthopedist.  (AR 272).  On February 22, 2003,  Dr. Ha'Eri examined Plaintiff for ongoing subjective complaints of neck pain, right shoulder pain, right rib pain, and back pain.  (AR 289, 296).  He conducted an orthopedic examination of Plaintiff and diagnosed her with a cervical, thoracic and lumbar myoligamentous strain.  Dr. Ha'Eri recommended ongoing chiropractic treatment and physiotherapy over the course of the next twelve weeks and prescribed Vicodin.  (AR 289).

On March 20, 2003, Plaintiff was examined by Dr. Sanjay Chauhan, a board certified neurologist and also a state appointed Qualified Medical Examiner. (AR 252).  At that time, Plaintiff described her complaints as neck pain with radiating pain, tingling and numbness with spasms to the right shoulder to right hand; headaches; low back pain with radiating pain, tingling and numbness with spasms to right leg to foot.  (AR 253, 261).  In conjunction with his neurologic examination, Dr. Chauhan performed a nerve conduction study on Plaintiff.  (AR 261, 263).  The results of that testing were negative for compressive neuropathy; negative for cervical radiculopathy; and slight right S1 radiculopathy.  (AR 263).

As a result of his examination of Plaintiff, Dr. Chauhan diagnosed Plaintiff with cervical strain with right cervical radiculopathy; lumbar strain with right lumbar radiculopathy; right shoulder

10

strain; right forearm and hand strain; secondary muscle contraction headaches due to cervical and lumbar strains. (AR 258). In a portion of his written report, Dr. Chauhan observed that the current treatment Plaintiff was receiving from Dr. Ybarra was appropriate and that Plaintiff needed to continue that course of treatment. (*Id.*) Dr. Chauhan also recommended that Plaintiff "undergo further work-up with an MRI scan of the cervical spine and lumbar spine due to continued radicular symptoms and signs.... For the right shoulder and right upper extremity the patient may benefit from orthopedic evaluation if it has not been accomplished yet. Continue conservative chiropractic and physical therapy per Dr. Ybarra. Continue current pain medication with Vicodin, Sonata, and Tylenol 500 mg. t.i.d. Follow up with Dr. Chauhan as needed." (AR 259).

On April 9, 2003, MRI scans of Plaintiff's cervical and lumbar spine and right shoulder were done at Dr. Ybarra's request. (AR 364-369). Dr. William Glenn, a radiologist with Key Health Medical Group, read those scans. (AR 365, 367, 369). The MRI of the cervical spine revealed objective findings of cervical curvature less lordocic (i.e., more straightened) than usually seen; multiple disc spaces show loss of signal; and multiple minor levels of disc bulging vs. endplate ridging, slightly indenting thecal sac as noted. (AR 366, 367, 307). The MRI of the right shoulder showed only a tiny amount of joint fluid noted. (AR 364, 365). The MRI of the lumbar spine revealed T12/L1 shows loss of disc space signal; L4/5 shows subtle loss of disc space signal, slightly reduced left foramen, and 1-2 mm disc/annulus bulge with endplate ridging slightly indenting the thecal sac; L5/S1 shows loss of disc space signal and 2-3 mm disc annulus bulge in conjunction with endplate ridging minimally indenting thecal sac, if at all. (AR 368, 369).

On June 19, 2003, Dr. Ybarra ordered computerized testing of Plaintiff's range of motion. (AR 359-363). That testing produced objective findings of impaired range of motion in areas of Plaintiff's cervical and lumbar spines. (AR 273, 274). On June 19, 2003, Dr. Ybarra also issued a Permanent and Stationary Report about Plaintiff's condition to the Disability Evaluation Unit claims staff at the State Compensation Insurance Fund. (AR 271-276). In that report, Dr. Ybarra concluded that Plaintiff had sustained a moderate neuromusculo-skeletal ligamentous injury and diagnosed her with cervical alordosis; shoulder tendonitis; myofascitis; 2mm L4/L5 disc bulge; 3mm L5/S1 disc herniation; lumbar radiculitis; lumbar myofascitis; and a healed rib contusion. (AR 272).

Dr. Ybarra reviewed a fairly long list of objective factors indicating disability , i.e., signs detected by medically acceptable clinical diagnostic techniques as well as laboratory findings, identified work-related impairments that would preclude Plaintiff from performing her previous work, and discussed the future medical care treatment of Plaintiff's condition would likely entail. (AR 273-275). In that regard, Dr. Ybarra noted:

> Since the principal injury was moderate neuromusculo-skeletal ligamentous in nature, occasional exacerbations are probable. Therefore, future medical care would be appropriate; occasional chiropractic/physiotherapy visits, supported by medical with follow-up ortho-surgical evaluation with any significant exacerbation should suffice. [¶] Mrs. Lemus' exacerbations are admittedly best relieved with spinal manipulative therapy, physiotherapy and medication. ...

(AR 275).

On July 1, 2003, Plaintiff was seen by Bharati H. Shah, M.D., anesthesiologist and pain management specialist at the request of Dr. Ybarra. (AR 319). Dr. Shah conducted orthopedic and neurologic examinations of Plaintiff as part of this consultative process. (AR 321-322). At that time, Plaintiff described her neck pain as constant aching and burning and reported experiencing headaches three to four times a day. (AR 319). Plaintiff also described numbness in the back of her neck. She said that bending her head or making any abrupt movement increased her pain level. She also noted that medication helped to decrease it. Plaintiff further described right shoulder cramping and aching pain, radiating down to her fingers. She said her right arm pain was a constant stabbing pain with numbness, tingling, and with weakness of the right arm. Lifting her arm increased her pain level; medication and chiropractic treatment decreased it. (*Id.*) Plaintiff also reported low back pain, a constant severe aching pain, radiating down the right leg causing cramping in calf and knee. (AR 320). Prolonged sitting, prolonged standing, lying and bending increased her pain level; medication and chiropractic treatment decreased it. (*Id.*)

Dr. Shah independently examined Plaintiff and also reviewed the results of the MRI scans done in April of 2003. (AR 321-323). His clinical impressions were: (1) musculo ligamentous sprain/strain cervical spine and lumbar spine; (2) degenerative disc disease; (3) lumbar radiculopathy; (4) bilateral sacro-ileitis and sacro-iliac dysfunction; (5) rule out discogenic pain; and (6) post traumatic headaches. (AR 323). Dr. Shah recommended lumbar and epidural steroid

blocks; right suprascapular nerve block; sacro-iliac joint injection; and lumbar facet blocks. He also recommended that Plaintiff continue her chiropractic treatment, physical therapy and exercise program as well as her present pain medications (then 500 milligrams of aspirin). (*Id.*)

On August 14, 2003, Dr. Randy Willis, a licensed chiropractor and another state appointed Qualified Medical Evaluator, examined Plaintiff at his Visalia, California office in connection with the injuries sustained in her October 2002 work-related accident.[3] (AR 286-309.) Dr. Willis noted that Plaintiff's then current complaints included persistent lower back pain, radiating down both lower limbs to the ankles. (AR 291). Plaintiff rated the lower back pain severity as a seven on a scale of one to ten, ten being the most severe. Her symptoms increased with periods of prolonged walking, sitting or standing. Plaintiff also described radiating pain down into her right leg that Plaintiff claimed were always present and included cramping; the pain radiating down her lower left leg was sometimes there. Plaintiff also described persistent neck pain, rated as a seven, and explained that the pain increased when she rotated or extended her neck. She also experienced headaches which started in the back of her neck and radiate to her temples. And she reported pain in her right shoulder and forearm, along with right lower rib pain. As part of his evaluation, Dr. Willis also reviewed the symptoms, signs and laboratory findings generated in Plaintiff's medical case record to that date. (AR 293-297).

Dr. Willis's independent diagnostic impressions of Plaintiff's condition included right rib contusion, secondary to the accident, resolved; cervicothoracic myofascial syndrome with muscle tension headaches, secondary to the industrial injury, chronic; right shoulder sprain, secondary, chronic; C4/5, C5/6, C6/7, and C7/T1 one to two millimeter disc bulges, secondary, chronic; L4/5 one to two millimeter disc bulge, secondary, chronic; L5/S1 two to three millimeter disc bulge with slight right S1 radiculopathy, secondary, chronic; lumbrosacral myofascial syndrome, secondary, chronic. (AR 304-305). Dr. Willis identified objective factors of disability, noting the April 2003 MRI scans revealed small disc bulges at C4-5, C5-6, C6-7, C7-T1, L4-5, and L5-S1, which "ha[d]

---

[3] Dr. Willis had been asked to do so by an administrative panel as part of the adjudication of Plaintiff's pending workers' compensation disability claim and would prepare a report for the Disability Evaluation Unit for the State Insurance Compensation Fund claim. (AR 286, 286-309).

probability in contributing to the current symptomatology." (AR 305, 307). The March 2003 nerve

conduction study revealed some slight right S1 radiculopathy, which he found "correlate[d] with the

increased symptomatology to the right lower limb." (AR 306, 307).

As for Plaintiff's future medical care, Dr. Willis concluded that it "will be an issue," noting:

> Post-traumatic musculoligamentous and vertebral disc injuries of this
> nature can result in exacerbations and flare-ups that with reasonable
> medical probability will necessitate periodic treatment. Exacerbations and
> recurrences are to be reasonably expected from this industrial injury.
> Treatment should consist of chiropractic manipulation treatment; deep
> tissue massage; physical therapy for pain modalities; non-supervised
> therapeutic progressive stretching/strengthening exercise program... . [¶]
> It is my opinion that Ms. Lemus is currently not a candidate for any
> surgical procedures. If Ms. Lemus' symptomatology should progressively
> deteriorate and produce the need for further investigation to determine the
> exact cause of said symptomatology, I recommend a future medical
> provision to allow for prescription medication for pain, referrals for
> diagnostic, orthopedic, neurological or pain management consultations... .

(AR 308).

Plaintiff continued to see Dr. Ybarra regularly for chiropractic care relating to her original

injuries. (AR 416-421). She received approximately sixteen treatments from Dr. Ybarra in 2005,

eleven treatments in 2006 and at least seven through early July, 2007, including massage and

electrical muscle stimulation. (AR 416, 417, 433). Much of the treatment was necessitated by

episodic exacerbations of Plaintiff's condition. (AR 370-372, 375-378, 380-385, 387, 389-393, 395-

397).

Some of these episodes apparently prompted additional consultative referrals. (AR 318).

On January 26, 2004, Plaintiff was again examined by Dr. Shah, upon Dr. Ybarra's recommendation.

(*Id.*) Plaintiff continued to describe her low back pain as constant, severe, ache that radiated down

her right leg causing cramping in calf and knee and numbness sensation. She also reported problems

with pain in her right shoulder that "radiates to her upper extremity with numbness sensation." (*Id.*)

Prolonged sitting, prolonged standing, lying and bending increased her pain level; medication and

chiropractic treatment helped decrease it. Plaintiff reportedly slept five hours per night.

Dr. Shah's objective findings from this examination included increased lumbar lordosis;

moderate tenderness over the right lumbar spinous processes, the right sacro-iliac joints, right gluteal

and paravertebral regions and both pelvic brims; and right paraspinal spasm. "Straight leg raising

was positive at 70 degrees in the right and negative on the left. Patrick's test was positive on the right and negative on the left. Pelvic tilt test was positive. Flexion was limited to 3 feet from the ground and was painful. Deep tendon reflexes [were] normal. Sensation to touch and pinprick [was] decreased on the right leg." (*Id.*) Dr. Shah's diagnoses were (a) musculo ligamentous sprain/strain cervical spine; (2) musculoligamentous sprain/strain lumbar spine; (3) lumbar and cervical radiculopathy; and (4) myofascial sprain/strain of the lumbar spine. The pharmaceutical plan Dr. Shah recommended was Motrin 800 mg., twice each day; Soma 350 mg. once at bedtime; and continuation of chiropractic treatment, physical therapy, and exercise program. (*Id.*)

Having initiated the Social Security Act disability claims process in April 2004 (AR 74, 156, 186), Plaintiff underwent a consultative examination on July 7, 2004, at the agency's request. (AR 325-327). Dr. Gurdin, an orthopedist, conducted the examination and prepared his written report of the same date. (*Id.*) He noted that Plaintiff's chief complaint was constant aching throughout the entire spine which worsened with activity, including standing, walking, sitting, bending, lifting, and twisting. (AR 325). Plaintiff also reported constant pain in her right arm and right leg. (*Id.*) Dr. Gurdin's report also acknowledged that Plaintiff had been "diagnosed with myofascial pain syndromes involving the neck, upper back, and lumbar area. Her only treatment has been from a chiropractor and she still goes twice a month. There has ... been no improvement." (*Id.*) This consultative examiner noted that Plaintiff's stated limitations were an ability to walk one-quarter mile, to stand for one hour a time, and to sit for one hour. Plaintiff also explained that she could climb one flight of stairs slowly and could lift 25 pounds, 15 pounds more easily. In his report. Dr.Gurdin also recorded that Plaintiff's condition was currently treated with chiropractic care, Advil, and an analgesic gel.

Dr. Gurdin's physical examination of Plaintiff included evidence of a positive Wadell sign, i.e., low back pain complained of with light pressure over the head. (AR 326). Plaintiff also complained of some worsening of her back pain with gentle trunk rotation which did not appear to move the spine. (*Id.*) His examination appears to have produced some evidence of both positive and negative findings. (AR 325-326). Dr. Gurdin did diagnose Plaintiff with cervical, thoracic, and lumbar myofascitis; minimal degenerative disc disease in the cervical and lumbar areas; possible

myofascial pain syndrome; and obesity. (AR 327). He concluded that "[i]n spite of the patient's complaints, the objective physical findings were minimal. There did not appear to be significant impairment related physical restrictions." (*Id.*)

Plaintiff was referred to Dr. Boota Chahil, a neurologist, by Dr. Ybarra for a further consultative examination. (AR 376, 408). Dr. Chahil initially examined Plaintiff on October 20, 2005. (AR 408). Her chief complaint at that time was back and neck pain. Plaintiff reported to Dr. Chahil that she "gets a little better with the therapy" but continues to have pain. (*Id.*) At that time, Plaintiff reported not taking any medication for the pain. Dr. Chahil conducted a neurological examination of Plaintiff and noted, under "Impression," a "[h]istory of fall with right sided injury. No focal deficit is noted on the examination." (AR 408, 409). Dr. Chahil prescribed Topamax, at 25 mg. per day, apparently anticipating a slow increase in dosage. (AR 409).

Dr. Chahil saw Plaintiff again on November 9, 2005, noting some improvement but still some pain. (AR 407). He recommended that the Topamax continue to be increased slowly.

At Plaintiff's next appointment about a month later, Plaintiff reported to Dr. Chahil she had discontinued taking medication for reasons that are not disclosed in the record and that she had some pain again. (AR 406). Dr. Chahil restarted the Topamax and again planned to increase the dosage slowly. In August 2006, at her follow up visit, Dr. Chahil noted that Plaintiff was taking the medication and "doing fairly well." (AR 405). Dr. Chahil's impression continued to be "chronic pain" and his treatment plan for her headache pain included continuation of Topamax and "observe closely." (*Id.*) Plaintiff returned to see Dr. Chahil for another follow up visit in January 2007. (AR 410). She reported still having some pain. Dr. Chahil recommended that she "continue all meds and observe closely." (*Id.*)

2. <u>Medical/Health Care Provider Opinion Relating to Severity of Impairment and Residual Functional Capacity</u>.

As noted above, Dr. Ronald Ybarra prepared his June 19, 2003 Permanent and Stationary Report for use in adjudicating the appropriate disposition of Plaintiff's State Compensation Insurance claim. (AR 271-276). Part of that report included a discussion about "work preclusions," limitations on Plaintiff's ability to work resulting from her industrial accident. (AR 275). In that

section, Dr. Ybarra noted that Plaintiff was a farm laborer whose work duties included heavy lifting. He found that Plaintiff's injuries to her neck precluded her from heavy lifting or prolonged neck flexion and that injuries involving her lower back resulted in work preclusions of no heavy lifting; no prolonged standing or sitting; and no repetitive bending. Here, Dr. Ybarra concluded that Plaintiff would not be capable of any "substantial work" because of her lower back injuries. (*Id.*) Dr. Ybarra also concluded that Plaintiff's shoulder injuries did not result in any work preclusions.

On September 2, 2003, Dr. Randy Willis prepared a report for the Disability Evaluation Unit for the State Insurance Compensation Fund claim. (AR 286-309). Under "Work Restrictions," Dr. Willis notes:

> In regards to work restrictions, while incorporating information from medical records, history of the industrial injury given by Ms. Lemus during the interview and information reported on the DEU From 100 and Job Description of Employee's Job Duties, Ms. Lemus is unable to perform the usual and customary duties as an "Olive Picker." It is my opinion that Ms. Lemus has permanent work restrictions referable to the cervical spine and lumbar spine.
>
> Ms. Lemus' permanent work restriction to the cervical spine ranges between a "no repetitive motions of the neck to no heavy lifting."
>
> Ms. Lemus' permanent work restriction to the lumbar spine ranges between a "no heavy lifting to no substantial work."
>
> Ms. Lemus has not permanent work restrictions related to the right shoulder, as there are essentially no objective findings.

(AR 307).

On August 12, 2004, State Agency physician, D. Sharbaugh, a board certified orthopedist, rendered an opinion about Plaintiff's residual functional capacities. (AR 328-335, 353-355). Dr. Sharbaugh reviewed a summary of the medical evidence in the record, but did not examine Plaintiff. The summary was prepared by a disability evaluator analyst with the Social Security Administration and dated August 5, 2004. (AR 353-355). Although the summary contained a brief description of much of the medical evidence in the case record to that date, it did not include all of it. Missing is information about the examination conducted by Dr. Ha'Eri; the various prescription medications given to Plaintiff for pain, including dosage and frequency; and other treatment Plaintiff had received for her condition, i.e., chiropractic and physiotherapy, including frequency, duration,

1  and results.  Under "Conclusions/Recommendations," the disability examiner noted:

2          No meets or equals.  Pain is a consistent complaint by the claimant, but the
           location of her pain varies. ... I believe that the claimant's subjective
3          complaints of pain and functional limitations are inconsistent and not fully
           credible.  Various chiropractors offer MSO's that preclude heavy lifting
4          and repetitive motions of the neck.  These statements are consistent with a
           medium level of exertion.  The ortho CE MD opined that the claimant has
5          no significant work-related limitations.  There was a positive Waddell's at
           the ortho ce.  Recommend a full range medium RFC, which takes into
6          consideration the mildly abnormal imaging studies.

7  (AR 355).  Under what appears to be Dr. Sharbaugh's signature, the words, "Agree" and "physical"

8  appear.  (*Id.*)

9          Dr. Sharbaugh completed a Physical Residual Functional Capacity Assessment on August 12,

10  2004.  (AR 328-335).  He described Plaintiff's primary diagnosis as minimal degenerative disc

11  disease of the cervical spine and lumbar spine.  (AR 328).  Dr. Sharbaugh concluded Plaintiff  was

12  able to lift and/or carry, including upward pulling, of up to 50 pounds occasionally and 25 pounds

13  frequently; she could stand and/or walk with normal breaks about six hours in an eight-hour

14  workday; she could sit with normal breaks for six hours in an eight- hour workday; there would be

15  no limitations on her ability to push or pull other than as shown for lift and carry.  (AR 329).

16  No postural, manipulative, visual, communicative or environmental limitations were imposed.

17  (AR 330-332).

18          In Dr. Sharbaugh's opinion, the severity or duration of Plaintiff's symptoms were

19  disproportionate to the expected severity or expected duration based on Plaintiff 's medically

20  determinable impairments.  (AR 333).  As part of his explanation, he referenced the "continuation

21  sheet," i.e., the disability examiner's August 5th report.  (*Id.*)  Dr. Sharbaugh also noted that, in his

22  opinion, "MRIs show no significant findings which could reasonably [produce] symptoms.  Positive

23  Waddells.  Tender all over.  Above support not fully credible allegations of sit/stand ½ hour."[4]  (*Id.*)

24  Dr. Sharbaugh acknowledged that there were treating or examining source statements in the case

25  record, i.e., Drs. Willis and Ybarra, both noted to be chiropractors, regarding Plaintiff's physical

26

27          [4]  It is not clear from this record that Dr. Sharbaugh reviewed the actual diagnostic imaging reports prepared by
        the radiologists or whether he relied on a reference to the "imaging studies" and a very limited description of their results
28      in the continuation sheet.  See AR 353.

18

capacities that differed significantly from his findings. (AR 334). He reported giving consideration to those opinion but essentially minimized their value on the basis that they were "not acceptable medical sources." (*Id.*) In explaining why their conclusions were not supported by evidence in the file, Dr. Sharbaugh stated, "DC's precluded heavy lifting and prolonged neck flexion. Dr. Ybarra precluded substantial work due to low back, prolonged stand/sit and no repetitive bending. Ortho CE exam unremarkable with [positive] Waddell sign." (*Id.*)

On December 1, 2004, State Agency physician, Ernest Wong, reviewed the medical evidence in the record, as summarized in the discussion and analysis prepared by the SSA's disability evaluator analysts. (AR 336-337). The second of these reports was dated November 22, 2004, is one page in length, adds no substantive information or analysis to the previous agency report[5], and concludes with a handwritten notation by Dr. Wong, "affirm initial RFC." (AR 336). Under "Conclusions/Recommendations," the agency's disability analyst notes "per review of initial case eor, agree with determination. MED RFC which is consistent w/ TS MSO [this reference is to the alleged opinions of Drs. Ybarra and Willis] precluding heavy work. ..." (AR 336).

In addition to his comment "MER reviewed and affrm initial RFC," Dr. Wong notes on the final page of the August 2004 Physical Residual Functional Capacity Assessment form initially completed by Dr. Sharbaugh that "I have reviewed all the evidence in file, and the assessment of 8/12/04 is affirmed as written." Dr. Wong's signature follows that notation, along with the date of December 1, 2004. (AR 335).

On July 9, 2007, Dr. Ybarra, who had continued to provide chiropractic treatment and evaluation to Plaintiff regularly and with relative frequency over the three years following Dr. Wong's opinion, completed a Residual Functional Capacity Questionnaire describing Plaintiff's status on as of July 2007. (AR 433-437). Dr. Ybarra described Plaintiff's prognosis as guarded, that she had suffered a permanent partial impairment and episodes of acute exacerbation to the affected

---

[5] The Disability Determination Rationale form on which these notations by Dr. Wong appear reports that agency had received duplicate copy of the Permanent and Stationary Report prepared by Dr. Ybarra; notes "recon" on the top of the form; reports no prior ALJ decision; and refers the State Agency physician reviewer to the medical history and objective findings contained in the August 12, 2004 continuation sheet. (AR 336).

areas since the initial accident.  (AR 433).  In that report, he stated that Plaintiff's last visit was July 5, 2007, that he had begun seeing her on December 17, 2002, and that he had seen Plaintiff approximately 75 times in his professional capacity.  (*Id.*)  The listed diagnoses were cervical intervertebral disc [*sic*], cervical radiculitis/neuritis, lumbar intervertebral disc syndrome, lumbar radiculitis.  (*Id.*).

In his questionnaire/report, Dr. Ybarra stated that Plaintiff's experience of pain, fatigue or other symptoms was occasionally[6] severe enough to interfere with attention and concentration needed to perform even simple tasks; Plaintiff was capable of tolerating moderate stress; in a competitive work situation, Plaintiff could walk for ½ hour without rest or severe pain; sit for 30-45 minutes before needing to get up or otherwise reposition; and stand for 30-45 minutes before needing to change postural positions.  (AR 434-436).  Dr. Ybarra reported that Plaintiff could sit about two hours total out of an eight-hour workday; stand and/or walk between four and six hours in an eight-hour workday; and that Plaintiff would need to walking around and/or resting several times each hour in order to accommodate her impairments.  (AR 436).  Dr. Ybarra also stated that Plaintiff would require a job that permitted shifting positions at will (from sitting, standing, or walking) and that she would need to take unscheduled breaks every hour of about 10 minutes.  (*Id.*)  Dr. Ybarra reported that Plaintiff could lift and carry a maximum of 15 pounds in a competitive work situation and that she could do no heavy lifting.  (*Id.*)  She could look down occasionally; turn her head right or left occasionally; look up occasionally and hold her head in a static position occasionally.  (*Id.*)  According to Dr. Ybarra, Plaintiff could rarely crouch or climb ladders but could occasionally stoop, bend, twist and climb stairs.  (*Id.*)  Dr. Ybarra did not suggest any manipulative limitations.  (AR 437).  He did explain that Plaintiff's impairments were likely to produce "good days" and "bad days" and that he anticipated Plaintiff would be absent from work as result of her impairments or her need for treatment more than four days per month.  (*Id.*)

///

///

---

6  Occasionally here means 6%-33% of an 8-hour workday.  (AR 434).

***B.***     ***Other Non-Medical "Other Source" Evidence Regarding Severity of Impairment and Work-Related Disability Status***

Plaintiff filed a workers' compensation claim for injuries sustained in the October 14, 2002 work-related accident with California's State Compensation Insurance Fund. (AR 175-177). Ultimately, that claim was resolved in Plaintiff's favor, resulting in an award for temporary and permanent disabilities. (*Id.*) The SSA case record in this matter contains a copy of the executed "Stipulations with Request for Award" in the Workers' Compensation Appeal Board matter of Domitila Lemus, Applicant vs. Jose Eduardo Real and State Compensation Insurance Fund, Defendants (case no. FRE 0226213). (AR 175-176). That document relates to the industrial accident producing the injuries for which Plaintiff now claims disability insurance benefits under the Act. It stipulates that Plaintiff was a field laborer on October 14, 2002 and that she sustained injuries to her right upper extremity, back, right shoulder during the course of her employment as a field laborer on that date. (AR 175). The stipulation further provides that, "[t]he injury caused permanent disability of 55 ½%" and that "[t]here is a need for medical treatment to cure or relieve the effects of said injury." (*Id.*) The award itself is dated August 3, 2004, signed by a judge of the Workers' Compensation Appeals Board, and grants Plaintiff permanent disability indemnity based on the 55 ½ % permanent disability finding. (AR 177).

***C.***     ***Testimony Given at July 190, 1007 Remand Hearing***

      1.    <u>Plaintiff's Testimony</u>.

Plaintiff testified though use of a Spanish language interpreter and was represented by counsel. (AR 56).

Plaintiff was 58 years old at the time of the second hearing. (AR 57). She had received little formal education, learning to read and write in Spanish at a relatively simple level as a child in Mexico. (AR 58). Plaintiff was not able to read or write in English and had a very limited understanding of the spoken English language. (*Id.*) Her employment history over past 15 years had been that of a harvest worker, picking primarily fruit. (*Id.*) She was a widow, her husband having died some time earlier. (AR 67).

///

Plaintiff testified to experiencing constant pain as a result of an injury she sustained on October 14, 2002. At the time of the injury, Plaintiff had been working harvesting an orchard. (AR 58-60). Because of the pain resulting from these injuries, Plaintiff now had trouble bending, could not sit in a chair and lean back, or the pain would worsen. (AR 59). Her right leg goes numb. (AR 59-60). There was pain in right shoulder, the back of her neck, and her lower back. (AR 60, 63). Plaintiff testified that she sees a chiropractor for treatment of her pain, explaining that she had been authorized to go twice each month but because of transportation problems, she was currently able to see the chiropractor only once per month. (AR 60). Plaintiff testified she was able to receive this care because her workers' compensation claim remained open for medical care. (*Id.*) Plaintiff also testified to receipt of disability payments as part of a workers' compensation award. (AR 67).

As for existing exertional and non-exertional capacities, Plaintiff said she could pick up 20 to 30 pounds but could not carry it any distance. (AR 61). She also said that her treating chiropractor had told her not to pick up more than 18 pounds. (*Id.*) When asked about her ability to lift weight for two to three hours in an eight- hour workday, she answered that she could pick things up and move them for some distance, but she "could not do this constant." (*Id.*) When asked how long Plaintiff would be able to stand at any one time, she testified that it varied. Sometimes she could stand for an hour and at other times, she could not. (*Id.*) On average, Plaintiff estimated that she could stand for 25 minutes at a time. (*Id.*) With regard to the total amount of time Plaintiff could stand over the course of an 8-hour workday, Plaintiff's answer was, "Maybe for a little while then." (AR 62).

Plaintiff estimated that she could sit about 40 minutes at a time and could bear it for an hour but that it would be very difficult. (*Id.*) She also estimated she could sit about three hours total. (*Id.*) When asked how far she could walk at any one time, Plaintiff indicated that she could walk for some unspecified distance but that she would have to sit down after that. (*Id.*) Plaintiff testified that she had to rest frequently during an average day; out of every hour, she estimated needing to rest 20 to 30 minutes. (AR 63). Plaintiff explained that she had trouble sleeping on her right side so she slept about 25 minutes in the morning. (*Id.*) She also testified that her need to rest with such frequency was the result of the pain she experienced. (*Id.*) In a normal week, Plaintiff has about

three days which she described as "real bad days where [she] doesn't do much of anything" because of the pain. (AR 63-64).

Plaintiff addressed her pain through regular chiropractic treatment. Her chiropractor provided massage therapy and what appears to be some kind of electrical muscle stimulation.[7] (AR 64, 417). He also gave her topical analgesics for the affected areas. (AR 64). Plaintiff testified that this treatment helped quite a bit with the pain for several days. Plaintiff also took medication prescribed by Dr. Chahil. (*Id.*) She had been taking Topamax but Dr. Chahil had recently changed her prescription to Lyrica. (AR 65). Plaintiff was now taking a 50 mg. dose of Lyrica three times per day and reported that it was helping to manage the pain. (*Id.*) The medication had been prescribed for persistent headaches Plaintiff began to experience after industrial injury. (AR 68).

With respect to her ability to perform the routine tasks of daily living, Plaintiff testified that in a normal day, she did housework, a little at a time, interspersed with periods of rest. (AR 66). Plaintiff would also make calls to people that she feels need company. Plaintiff did not have a drivers license and had not driven in over 10 years. Plaintiff cooked meals and did her laundry. (AR 66-67). Plaintiff also testified to problems with urinary incontinence. (AR 67).

2. Vocational Expert, Jose Chaparro.

Vocational expert Jose Chaparro testified that he listened to Plaintiff's testimony and reviewed the work-related background material submitted to him. (AR 69). As a result, he believed he had sufficient information to form an opinion as to the type of work in which Plaintiff had been previously engaged. Mr. Chaparro described that occupation as a fruit harvest worker, rated medium work unskilled by the Dictionary of Occupational Titles. (*Id.*) However, based upon his analysis, Mr. Chaparro believed that Plaintiff performed this job as heavy work. (AR 69-70).

---

[7] Dr. Ybarra's charting entries (AR 416-421) contain the designation "EMS" in the therapy section of the charting form. This reference appears to describe electrical muscle stimulation, a process where "electrical impulses applied to muscles using pads that conduct the impulses through the skin, producing a soothing, tingling sensation. The treatment is used to increase circulation, decrease pain and muscle spasm, and facilitate healing of injured soft tissues." *Glossary of Chiropractic Terms*, http://chiropracticcenter.googlepages.com/templatedonotpublish5 (last visited on March 23, 2009).

1     The ALJ posed two hypotheticals to Mr. Chaparro. In the first one, Mr. Chaparro was asked

2   to assume an individual 58 years of age, "illiterate, and [with] past relevant work as you've described

3   ... with a combination of severe impairments[8][, ...] and retains residual functional capacity to lift and

4   carry 50 pounds occasionally, 25 pounds frequently. This individual retains the ability to stand,

5   walk and sit for 6 hours each. Given these limitations, can such an individual perform claimant's

6   past work?" (AR 70). Mr. Chaparro testified that "she could do it as described in the DOT but not

7   as actually performed by [Plaintiff]." (*Id.*)

8     In his second hypothetical, the ALJ asked Mr. Chaparro to "assume a hypothetical individual

9   with the same vocational perimeters [*sic*] as in [the] previous question. This individual also has a

10  combination of severe impairments [*sic*]. Further assume that [this person] retains the residual

11  functional capacity to stand three hours total, walk approximately one hour, sit three hours total.

12  This individual retains the ability to lift occasionally 20 to 30 pounds. Given these limitations, can

13  such an individual perform the claimant's past work?" (*Id.*) Mr. Chaparro's response is "no." (*Id.*)

14    Plaintiff's counsel posed a series of hypotheticals to the vocational expert. In the first one, he

15  asked Mr. Chaparro to assume a person of the same age, education, work experience as the Plaintiff.

16  Mr. Chaparro was to further assume that this person could sit about two hours in an eight- hour

17  workday, and could stand and walk about four hours in that same workday. (AR 70-71). According

18  to Mr. Chaparro, that hypothetical person could not perform Plaintiff's past relevant work. (*Id.*)

19  Plaintiff's second hypothetical asked the vocational expert to assume an individual of the same age,

20  education, and work experience as Plaintiff and who needed to take unscheduled breaks during an

21  eight-hour day once each hour for 10-20 minutes. (AR 71). Mr. Chaparro replied that those

22  limitations would preclude that individual from performing Plaintiff' past relevant work. (*Id.*) The

23  third hypothetical asked the vocational expert to again assume a person of the same age, with the

24  same education and work experience as Plaintiff, and someone who would likely be absent from

25  work for more than four days a month due to her impairments or her need for treatment. (*Id.*)

26  Again, it was the expert's opinion that such a person could not perform Plaintiff's past relevant

27

28
      _____

      [8] Nowhere is the "combination of severe impairments"actually specified for purposes of these hypotheticals.

                                           24

work. (*Id.*)

The last in Plaintiff's series of hypotheticals asked Mr. Chaparro to assume a person who could do "no heavy lifting, no prolonged neck flexion." (*Id.*) This person was "precluded from substantial work. No prolonged standing or sitting. No repetitive bending. With those limitations, could this person perform [Plaintiff's] past relevant work?" (*Id.*) His answer was "no." (AR 72). Plaintiff's counsel followed up with the question, "Could that person perform any other work in the national economy?" (*Id.*) Mr. Chaparro's answer was, again, "no." (*Id.*) The expert did explain that, in answering these last two questions, he assumed that the phrase, "precluded from substantial work," meant that this person was unable to work on a consistent basis. (*Id.*)

## THE ALJ'S FINDINGS AND CONCLUSIONS AFTER REMAND HEARING

The ALJ determined that Plaintiff's earning records showed that Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2007 (AR 23); that Plaintiff had not engaged in substantial gainful activity from October 14, 2002, the date on which Plaintiff claimed her disability began, through the date of the ALJ's decision (AR 23, 27); and that Plaintiff had degenerative disc disease, a severe impairment that caused significant limitations in her abilities to perform basic work activities but that this impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (AR 25). Addressing the issue of obesity raised by the Appeals Council (AR 104), the ALJ found that Plaintiff's obesity was a slight impairment which had only minimal, if any, effect on her ability to work. (AR 24).

With respect to Plaintiff's residual functional capacity, the ALJ found that Plaintiff could sit, stand, and/or walk in combination for six hours in an eight-hour workday and could lift and carry 50 pounds occasionally and 25 pounds frequently. (*Id.*) The ALJ made no findings regarding other exertional or non-exertional residual functional capacities Plaintiff may have had. (AR 24-27). However, the ALJ did find that Plaintiff was capable of performing her past relevant work as a fruit harvest worker, work that did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. (AR 27). Here, the ALJ noted:

> In comparing the claimant's residual functional capacity with the physical
> and mental demands of this work, I find that the claimant is able to
> perform it as generally performed. [Vocational expert] Mr. Chaparro

25

testified that the claimant's work as a fruit harvest worker is classified by the Dictionary of Occupational Titles as unskilled medium work, but is unskilled heavy work as the claimant performed it. Mr. Chaparro also testified that an individual with claimant's residual functional capacity would be able to perform this work as it is performed in the national economy.

(*Id.*)

Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the Act, from October 14, 2002 through the date of his decision and concluded that Plaintiff was not entitled to disability insurance benefits or widow's insurance benefits under the Act. (*Id.*)

## ISSUES

In her Opening Brief ("AOB" (Doc.15)), Plaintiff asserts the following errors:

1. The ALJ failed to properly consider the chiropractic opinions and assessments in this record.

2. The ALJ's failure to obtain one or more consultative examinations regarding Plaintiff's allegedly disabling condition was error.

3. The ALJ's findings with regard to the credibility of Plaintiff's subjective complaints are not supported by substantial evidence.

## DISCUSSION

A. **THE ALJ DID NOT PROPERLY EVALUATE THE MEDICAL SOURCE OPINION EVIDENCE OR THE NEED FOR FURTHER CONSULTATIVE EXAMINERS**

Plaintiff challenges the analysis and weight given to the opinions and assessments of Drs. Ybarra and Willis, the two chiropractic practitioners central to issues and evidence involving the evaluation of Plaintiff's disability in this case. Both professionals provided evidence about the severity of Plaintiff's impairments and the impact of those impairments on her continuing ability to do the fruit harvest laborer work she had done throughout her employment career. Although her argument is not sharply focused, it does seem that the provisions of the Appeals Council's remand order is the touchstone of many of the points she raises here. Consequently, the Appeals Council's remand order is standard that will guide the analysis and discussion of error on this issue.

In discussing the bases of its remand order, the Appeals Council noted evidence tending to show that both chiropractors Ybarra and Willis had assessed Plaintiff to have exertional limitations inconsistent with the residual functional capacity established by the ALJ, i.e., medium, unskilled,

with no postural, communicative, manipulative, visual or environmental limitations. (AR 103-104). The Appeals Council observed, "20 CFR 404.1527 explains how medical opinions from 'acceptable medical sources' are evaluated. However, chiropractors are not considered acceptable medical sources (20 CFR 404.1513(d)). Yet, evidence from other sources can still be used to evaluate the severity of a person's impairments and needs to be addressed in accordance with the latter regulation and Social Security Ruling 06-3p." (AR 104). Apparently finding the ALJ's explanation given for disregarding or discounting these opinions inadequate,[9] the Appeals Council ordered the ALJ to "provide rationale regarding the weight he accords to the medical opinions/assessments in accordance with 20 CFR 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p." (*Id.*) In doing so, the ALJ was cautioned to consider the entire record and to provide discussion and rationale for the conclusions reached concerning the specific limitations resulting from the claimant's impairments. Moreover, in an apparent recognition the current state of the medical evidence might not be sufficient to reach a reliable and accurate result, the Appeals Council instructed the ALJ "to obtain one or more consultative examinations regarding the claimant's condition," "as appropriate." (*Id.*)

Examining the record before this Court, the ALJ failed to comply with these provisions of the Appeals Council's remand order. There is very little discussion and rationale about the bases upon which the ALJ found Plaintiff to have a residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently and sit, stand and/or walk six hours in an eight-hour workday. And what little there is does not satisfy the requirements for legal sufficiency.

Although the ALJ's subsequent opinion contains references to the opinions of Dr. Gillespie, Dr. Chauhan, Dr. Ybarra, Dr. Shah, Dr. Willis, Dr. Gurdin, Dr. Chahil, and the "state agency consultants," the ALJ does not provide this Court with sufficient information to permit the Court to know with reasonable certainty the bases upon which he concluded that Plaintiff had the residual

---

[9] The Appeals Council also pointed out with some emphasis that the ALJ's reliance on evidence indicating that Dr. Ybarra discharged the Plaintiff as "cured" on July 31, 2003 was, simply put, wrong. The Appeals Council instructed that this evidence merely stated that Plaintiff was "permanent and stationary" as of June 19, 2003. (AR 104).

abilities to perform her past relevant work as a fruit harvest worker.[10]  From the ALJ's remand decision, it is apparent that he discounted the opinions of Dr. Ybarra and Dr. Gurdin.  (AR 25, 26). The ALJ does not tell us what, if any, weight he gave to the medical evidence provided by Drs. Gillespie, Shah, Chauhan, and Chahil.[11]  Curiously, the ALJ does not discount the assessment of Dr. Willis, another chiropractor, on the basis that he is not an acceptable medical source – a disparity fundamentally at odds with the ALJ's treatment of Dr. Ybarra's opinion.  Instead, the ALJ states that Dr. Willis's assessed limitations regarding Plaintiff's functional capacities "essentially represent[ed] a medium residual functional capacity" (AR 26), an erroneous conclusion, as discussed more fully below.

The only evidence which is "afforded significant weight" by the ALJ are the opinions of the State Agency consultants.  (AR 27).  In this regard, the ALJ's full discussion and rationale for reliance on those opinions is, "[a]s for the opinion evidence, the state agency consultants evaluated the evidence of record and determined that claimant was limited to a full range of medium exertional activity [citations to exhibits omitted], which is afforded significant weight." (AR 27).  20 C.F.R. § 404.1527(f)(2)(ii) requires the ALJ to *explain* the weight given to the opinions of a State Agency non-examining medical consultant, not simply quantify it.

Even had he done so, the record does not support a finding of sufficiency, based upon substantial evidence.  A careful examination of the record in connection with the opinions of the State Agency physicians upon which the ALJ principally relies shows that neither doctor examined Plaintiff and both rendered opinions as to her residual functional capacity that  were quite stale, those

---

[10]  Distilling a rationale for the ALJ's residual functional capacity determination from this record and identifying the evidence supporting that rationale would require the Court affirm the ruling on grounds the ALJ did not consider and analyze.  That is impermissible.  "We are constrained to review the reasons the ALJ asserts.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947); *Pinto v. Massanari*, 249 F.3d 840, 847-848 (9th Cir. 2001).  It [is] error for the district court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

[11]  It is also significant here that these various opinions were mentioned and analyzed not in the context of articulating a basis for his determination of residual functional capacity but, rather, in discounting the credibility of Plaintiff's subjective complaints.  In the ALJ's words, "for all of the above and foregoing reasons, the claimant's testimony and written statements are not credible to the effect [that] she is totally precluded from all sustained work activity (SSR 96-7p)."  (AR 27).

opinions having been given three years earlier and made on the basis of even older medical evidence. Dr. Wong had no known specialty (see 20 C.F.R. § 404.1527(d)(5) where knowledge of a particular doctor's specialty is essential to assignment of weight) and his opinion is best characterized as cursory. *Cf. Murray v. Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports).

Dr. Sharbaugh, who was a specialist in orthopedic medicine, did provide some relevant evidentiary support for his opinion, at least as of the time it was rendered. However, there are significant problems with that support.[12] First, Dr. Sharbaugh essentially dismissed the opinions of Drs. Ybarra and Willis on the ground that they were not acceptable medical sources. (AR 333, 334). The order of the Appeals Council indicates that minimizing these opinions in such a way was not consistent with the guidelines contained in Social Security Ruling No. 06-3p. Second, Dr. Sharbaugh's opinion relies, in part, on the conclusions and findings of consulting examiner Dr. Gurdin, whose opinion was specifically not given substantial weight by the ALJ in the remand decision because "it [was] not entirely consistent with the objective evidence." (AR 26). Third, Dr. Sharbaugh's conclusions appear to rely, in part, on summaries of medical evidence, including laboratory finding and clinical signs, that were not comprehensive in scope or content. Those summaries do not appear to include information that might well have been critical to the accuracy and reliability of the doctor's assessment. Fourth, Dr. Sharbaugh's opinion was based exclusively on information about Plaintiff's health and functional status gathered and compiled three years earlier.

Although cautioned to provide a better analysis and discussion of the opinions of the chiropractic practitioners and to do so in a manner that comports with Social Security 06-3p, there is insufficient evidence the ALJ did so. With respect to the discussion of the medical opinions and assessments in this record, the *only* change in the language between the first and second decisions is found in the discussion of Dr. Ybarra's assessment.[13] In the decision that formed the basis for the

---

[12] The Court reiterates the prohibition against affirming the ALJ's ruling on grounds he did not consider and analyze. "It [is] error for the district court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss." *Connett*, 340 F.3d at p.874.

[13] The ALJ did not alter his discussion of Dr. Willis's assessment in any way.

29

remand, the ALJ's discussion of Dr. Ybarra's professional involvement with Plaintiff consisted

almost entirely of the following:

> Ms. Lemus also received treatment from Dr. Ybarra, a chiropractor, consisting of conservative chiropractic and physical therapy modalities of treatment (Exhibit 3F; 5F, pp. 4, 6; Exhibit 14F). Dr. Ybarra opined that work preclusions with regard to the neck included no heavy lifting or prolonged neck flexion. He felt her low back condition precluded heavy lifting, prolonged standing or sitting, and repetitive bending (Exhibit 3F, p. 8). On July 31, 2003, Dr. Ybarra discharged the claimant as "cured" (Exhibit 14F, p. 33).

(AR 95, 94-96).

Upon remand, the ALJ expanded his discussion of Dr. Ybarra's assessment and treatment to

include a fuller disquisition.

> Dr. Ybarra, a chiropractor, appears to have been selected as the claimant's primary Worker's Compensation medical source, and his treatment has consisted of conservative chiropractic and physical therapy modalities of treatment. Dr. Ybarra opined initially that work preclusions with regard to the neck included no heavy lifting or prolonged neck flexion. He felt her low back condition precluded heavy lifting, prolonged standing or sitting, and repetitive bending. On July 31, 2003, Dr. Ybarra discharged the claimant as "cured" (Exhibit 14F, p. 33 [AR 402]). However, subsequent records from his office show medication management from February 2006 through January 2007 and consists of brief comments that the claimant is "deconditioned" or "improved." Nonetheless, in a July 9, 2007 Medical Source Statement, Dr. Ybarra stated that since October 14, 2002, the claimant has been able to lift and carry 5 pounds, sit, stand and/or walk 30-40 minutes at a time, and sit 2 hours and stand and/or walk 4 hours in an 8-hour workday (Exhibit 20F). She would have occasional interference with attention and concentration, but could maintain them for more than 2 hours at a time. The claimant could perform jobs with moderate stress, but her limitations would interfere with her activities more than 4 days a month. I do not assign much weight to Dr. Ybarra's opinion, as it is not supported by the objective medical evidence and is contrary to his acceptance of the Agreed Medical Examiner's Permanent and Stationary Report (Exhibit 14F, p. 33), he is not an accepted medical source, and the other opposing medical sources are physician specialists, whose opinions are entitled to greater weight. [Most of the ALJ's citations to exhibits in the record are omitted.]

(AR 25).

There are several problems with the ALJ's revised discussion and analysis. First, the fact that

Dr. Ybarra is not an "acceptable medical source" for purposes of establishing an impairment does

not render his opinions irrelevant or unhelpful in determining the severity of Plaintiff's impairments

or the effects those impairments have on her ability to work. 20 C.F.R. § 404.1513(d) provides that,

in addition to evidence from acceptable medical sources, the Commissioner may also use evidence from other sources to show the severity of impairment and how it impacts work-related abilities. Social Security Ruling No. 06-3p states that information from sources who are not "acceptable medical sources," i.e., "other sources," "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." The ruling further advice that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects ... ." And, "[t]he weight to which ... evidence [from medical sources who are not 'acceptable medical sources'] may be entitled will vary according to the particular facts of the case, the source of that opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors ... ." (*Id*.) Included factors are (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s), and (6) any other factors that tend to support or refute the opinion. (*Id.*)

It is clear from this record that no such evaluation of Dr. Ybarra's assessments appears in this record on remand. That was the order of the Appeals Council and the ALJ did not comply with that directive in rendering his remanded decision. The fact that Dr. Ybarra has treated Plaintiff throughout the pendency of this matter is not the subject of comment. The fact that Plaintiff has seen Dr. Ybarra for treatment 75 times between her first contact and the remanded administrative hearing goes unmentioned. Dr. Ybarra's comprehensive and detailed Permanent and Stationary Report wherein he describes the severity of Plaintiff's impairments and their functional impacts on her work-related abilities, i.e., her pertinent work duties included heavy lifting which she could no longer do, are noted but followed with the discredited statement that, on July 31, 2003, Dr. Ybarra discharged Plaintiff as cured.

The ALJ noted that Dr. Ybarra saw Plaintiff for medication management after that, from February 2006 through January 2007. (AR 25). In fact, the medical record the ALJ cites shows that

Plaintiff was actually treated by Dr. Ybarra throughout that period with massage and other physiotherapy. (AR 417). The medical record also shows that Plaintiff suffered a series of exacerbations to her underlying injuries throughout this period – exacerbations reasonably foreseeable given the nature of her injuries – which were treated by Dr. Ybarra. (AR 370-372, 375-378, 380-385, 387, 389-393, 395-397). Those exacerbations may account for whatever deterioration in Plaintiff's condition the ALJ deduced from Dr. Ybarra's July 2007 Residual Functional Capacity Questionnaire. The fact that Drs. Ybarra and Willis were both Qualified Medical Evaluators, appointed by California's workers' compensation regulatory bodies after demonstrating the ability to evaluate disability claims in industrial injury cases,[14] was not a factor considered by the ALJ in assigning weight to their opinions about the severity of Plaintiff's impairments or work-related limitations. These oversights and/or omissions are significant and undermine the ability of this Court to conclude that the ALJ reasonably complied with the terms of the Appeals Council's remand order.

The ALJ also discounts Dr. Ybarra's assessment because "it is not supported by the objective medical evidence." Unfortunately, the ALJ does not identify the objective medical evidence to which he refers. (AR 25). Much of the objective medical evidence in this record supports Dr. Ybarra's and Dr. Willis's conclusions about the severity of Plaintiff's impairments and their functional limitations. Among other results, there are x-rays showing degenerative disc disease and misalignment of a rib; there is a nerve conduction study showing radiculopathy; there is diagnostic imaging showing abnormalities in the lumbar and cervical areas of Plaintiff's spine; there are computerized range of motion studies showing some impairment; and there are results from several

///

---

[14] Plaintiff testified to receipt of a workers' compensation disability award for the injury that underlying her SSA claims. The administrative record contains documentation of that award, including the fact that it was rated a 55 ½ % permanent disability. (AR 175-177). While the ALJ's decision upon remand acknowledges some concurrent adjudication involving the state's workers' compensation claims process (*see* AR 25), the ALJ's decision makes no mention of the final award. Although 20 C.F.R. § 404.1504 provides that a disability determination made by another governmental or non-governmental agency is not binding on the Commissioner, SSR No. 06-34p clearly states that, although not binding, "evidence of a disability decision by another governmental or nongovernmental agency *cannot be ignored and must be considered*"[emphasis added]. It was not considered here.

physical examinations showing evidence of injury consistent with the one Plaintiff suffered. (*See* AR 272-275, 306-307).

Other objective medical evidence in this record *may* not have supported Plaintiff's claims. But given the considerable amount of medical and other evidence supporting Plaintiff's claim that she was unable to perform her past relevant work, the amount of time that had elapsed between the date of the decision and the last consultative examination ordered by the SSA (three years), and evidence from her treating doctor of some further deterioration of Plaintiff's condition, it was clearly unreasonable for the ALJ not to order additional consultative examinations, as Plaintiff has argued. The ALJ was directed to do so by the Appeals Council "as appropriate." (AR 104). Title 20 C.F.R. § 404.1519a(b)(4) and (5) provide direction here – situations that normally require a consultative examination include cases where (1) the medical evidence is ambiguous or insufficient and which cannot be resolved by re-contacting the claimant's medical source, or (2) there is an indication of a change in the claimant's condition likely to affect the ability to work and the current severity of the claimant's condition has not been established. At the time of the remand hearing, both of these situations were present. It was clearly "appropriate" to obtain updated medical opinions from consultative examiners based on the facts contained in this record and the failure to adhere to the instructions of the Appeals Council in this regard was error.

The ALJ also explained that he gave little weight to Dr. Ybarra's opinion because "the other opposing medical sources are physician specialists, *whose opinions are entitled to greater weight*"[15] [emphasis added]. (AR 25). The problem with this rationale is that it is not supported by the policies of the Commissioner. The opinions of a physician specialist are not entitled to greater weight than other source opinions *in every case*. The facts of the individual case are determinative. Social Security Ruling No. 96-03p provides, in part:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most

---

[15] This Court is uncertain who these opposing medical specialist sources are. The ALJ does not specifically identify them and the Court is left to guess.

qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

Other factual misstatements and misinterpretation of the evidence create problems in any "substantial evidence" analysis of the ALJ's opinion. First, Dr. Ybarra did not say in his July 2007 report that Plaintiff had the ability to lift and carry 5 pounds; he said she could lift and carry a maximum of 15 pounds. Second, Dr. Ybarra did not say that Plaintiff's "limitations would interfere with her activities more than 4 days a month" (AR 25); he said that he anticipated Plaintiff would be absent from work as result of her impairments or her need for treatment more than four days per month (AR 437). The difference is potentially significant in terms of the vocational expert's testimony regarding Plaintiff's ability to perform her past relevant work. Third, this Court's review of the record does not show any statement by Plaintiff or anyone else that she could as far as a mile, an ability the ALJ found her to have. (AR 25). Fourth, there is no genuine discrepancy between the residual functional capacities Dr. Ybarra found Plaintiff to have in July 2007 and the work preclusions he identified in June 2003.

In June 2003, Dr. Ybarra said that Plaintiff's work duties as a farm laborer included heavy lifting and that her neck and back impairments precluded her from performing that work. (AR 25). As indicated in the vocational expert testimony, Plaintiff's previous work was described as a fruit harvest worker with an exertional level of medium work. (AR 50, 69-70). In concluding that Plaintiff could not do her past work, Dr. Ybarra was saying that Plaintiff could not do work at medium exertional level in June of 2003. There is nothing in the July 2007 description of Plaintiff's exertional levels that contradicts Dr. Ybarra's earlier assessment. This later assessment appears to quantify the limitations described in his Permanent and Stationary Report rather than alter them.

Even assuming there was a disparity between the two reports, that disparity would not, in itself, justify the unexplained dismissal of Dr. Ybarra's opinions. Four years had elapsed between the two assessments and there is evidence that Plaintiff had experienced several episodes of exacerbation of the earlier injury during the intervening period. Additionally, Plaintiff had aged and, apparently, lost some degree of physical fitness over those years. (AR 370, 372, 380, 387, 389). It is difficult for this Court to find an inherent conflict between the two reports of Dr. Ybarra, either specifically or generally. However, had there been one in the ALJ's mind, a judicious approach to compliance with the Appeals Council's order should have indicated that additional consultative examinations were appropriate.

What is puzzling to this Court is the ALJ's treatment of the opinion of Dr. Willis.[16] The ALJ appears to find Dr. Willis's opinion useful insofar as the ALJ characterizes it as supporting a finding of "medium residual functional capacity:"

> Dr. Willis, another chiropractor, conducted a Qualified Medical Examination in August 2003. He noted the objective factors of disability included positive musculoskeletal and neurological findings to the cervical spine and lumbosacral spine regions; radiographic examination which revealed dextroconvex scoliosis of the cervical/thoracic spine and hypolordosis; electrodiagnostic studies showing right S1 radiculopathy; cervical hypolordosis and multiple levels of disc bulging as noted on MRI of the cervical spine; and 1 to 2 mm disc/annulus bulge at L4-5 and mildly reduced central canal and 2 to 3 mm disc/annulus bulge at L5-S1 of the lumbar spine as documented by MRI of the lumbar spine. Dr. Willis concluded that these limitations restrict the claimant from repetitive motions of the neck and well as the heavy lifting, and substantial work/heavy lifting of the lumbar spine. These limitations essentially represent a medium residual functional capacity. [Citations to the exhibits in the record omitted.]

(AR 26).

No reasonable understanding of Dr. Willis's report supports such a characterization. Dr. Willis explicitly stated that Plaintiff's impairments resulted in her inability to perform her past work as an olive picker and that Plaintiff was unable to return to that work (i.e., her past relevant work). (AR 307). That work, a fruit harvest worker, was defined by the Dictionary of Occupational

---

[16] The Court finds it difficult to ignore the jarring dissonance between dismissing Dr. Ybarra's opinion on the basis that he was not an acceptable medical source and citing Dr. Willis's opinion to support, however indirectly, a residual functional capacity finding.

Titles as medium and unskilled. (AR 69). To the extent that the ALJ concluded Dr. Willis's opinion was part of the evidence supporting his finding of medium residual functional capacity and the capacity of Plaintiff to perform her past relevant work, the ALJ was mistaken.[17]

The Court mentions this for two reasons. First, the Appeals Council order singled it out for comment and then ordered the ALJ to consider the "entire record" when arriving at a subsequent decision on remand. (AR 104). Moreover, the subsequent decision was to provide rationale for the weight accorded to the medical opinions and assessments contained in the record. (*Id.*) Second, this confused characterization of the exertional levels that Drs. Ybarra and Willis described in their respective reports appears to have created a situation where the only medical evidence not discounted or rejected by the ALJ (i.e., the stale opinions of the State Agency physicians) relied on a fundamentally inaccurate understanding of Plaintiff's functional capacities. These circumstances demanded fresh expertise (i.e., additional consultative examinations), but that was not obtained.

The assurances and procedures for adjudication of disability insurance benefits claims are set forth in the Code of Federal Regulations. The Appeals Council may remand a case to an administrative law judge to hold a hearing and issue a decision; it may also remand because additional evidence is needed or additional action by the administrative law judge is required. (20 C.F.R. § 404.977(a).) "The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." (20 C.F.R. § 404.977(b).) "When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge with instructions to take action and issue a decision or return the case to the Appeals Council with a recommended decision. If the case is remanded by the Appeals Council, the procedures explained in §416.1477 will be followed. ..." (20 C.F.R. § 404.983.) The ALJ's various failures to comply with the remand

///

---

[17] The ALJ was not alone in this misplaced reliance. Both SSA disability evaluator analysts reported that "[v]arious chiropractors offer MSO's that preclude heavy lifting and repetitive motions of the neck. These statements are consistent with a medium level of exertion" (AR 355) and "MED RFC which is consistent w/ TS MSO precluding hvy work" (AR 336).

orders, as discussed above, were error under the provisions of the Social Security Administration's regulatory framework and warrant remand.

B. **SUBSTANTIAL EVIDENCE SUPPORTS THE ALJS' CONCLUSIONS REGARDING THE CREDIBILITY OF PLAINTIFF'S SUBJECTIVE COMPLAINTS**

Plaintiff's argument on this issue is multi-pronged. Part of her argument recites the objective medical evidence in the record that supports the credibility of her excess pain complaints. (AOB at pp. 18-19, 21). She also points to the persistence and length of her efforts to obtain relief from that pain. (AOB at pp. 19-20). These are factors to be considered by the ALJ in assessing the credibility of a claimant's subjective symptoms under Social Security Ruling No. 96-7p. However, the problem with challenging the ALJ's decision in this fashion is that its premise is basically unsound. This Court does not review the record to determine whether some other set of evidentiary facts might constitute substantial evidence of the finding Plaintiff would like to have seen. Rather, this Court reviews the record to determine whether the ALJ's ruling is based upon substantial evidence in the record and the application of correct legal standards. *Morgan v. Commissioner*, 169 F.3d 595, 603 (9th Cir. 1999.)

Plaintiff also argues that the ALJ did not provide clear and convincing reasons to reject Plaintiff's claims of excess pain. (AOB 20.) Plaintiff is on more solid ground here.

"In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. An AL's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain testimony." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). But, absent affirmative evidence showing that the claimant is malingering, "the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834, (9th Cir. 1995) (citations and internal quotations omitted).

///

The ALJ found that Plaintiff's medically determinable impairment, i.e., degenerative disc disease, could reasonably be expected to produce some of the alleged symptoms. (AR 24-25). Neither party suggests that there is affirmative evidence in this record of malingering on Plaintiff's part. Therefore, the ALJ could properly reject or discount Plaintiff's testimony and other statements concerning her subjective symptoms only if clear and convincing reasons were given. *Lester*, 81 F.3d at p. 834.

There is substantial evidence in this record to show that the ALJ did so here. His rationale for discounting the weight of this evidence was quite clear – "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 25). In support of that rationale, the ALJ explained that the physical findings that might support her subjective complaints of excess pain were negligible; her subjective complaints were disproportionate to the objective medical findings in the record; her course of treatment was essentially a relatively conservative one, i.e., chiropractic treatment once or twice a month, anti-inflammatory over-the-counter analgesics, and prescription for Lyrica; none of the physicians Plaintiff saw advised her not to participate in substantial gainful activity; Plaintiff was not considered a surgical candidate; she had required no hospital or emergency care as a result of her impairments; and the preponderance of the credible medical evidence in the record documents only a preclusion from heavy work. (AR 26). Additionally, the ALJ noted that Plaintiff tended to "elaborate" with respect to her symptoms and that Plaintiff's engaged in a level of daily activities (housework, laundry, meal preparation, community volunteerism) that is consistent with someone able to perform basic work-related activities. (*Id.*)

One or two of the foregoing reasons are of questionable validity – the credible medical evidence of record precludes Plaintiff from at least a medium level of physical exertion (see above discussion) and the disproportionality of the objective medical evidence to the complaints of excessive pain is suspect (see Social Security Ruling No. 96-7p – "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the

individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence."). However, the other considerations are valid. The ALJ did not discredit or discount Plaintiff's subjective complaint of excess pain solely on the ground that it was not fully corroborated by objective medical findings. A relatively conservative course of treatment can be relied on in rejecting subjective complaints. *Johnson v. Shalala*, 60 F.3d 1428, 1433-1434 (9th Cir. 1995). The ALJ considered the ability of Plaintiff to perform routine tasks of daily living in a competent and regular manner, activities that he found consistent with basic work-related tasks. The ALJ also found that Plaintiff tended to "elaborate" with respect to some of her symptomatology, a legitimate ground for discounting the weight to be given to Plaintiff's subjective complaints. Amplification of symptoms can constitute substantial evidence to support discounting or discrediting a claimant's subjective complaints of severity. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

In this case, although there were two factors relied upon impermissibly by the ALJ, the ALJ nevertheless articulated clear and convincing reasons, supported by substantial evidence in the record, for discrediting Plaintiff's subjective complaints of excess pain. *Cf. Batson v. Commissioner of the Social Security Administration*, 359 F.3d 1190, 1196 (9th Cir. 2004). Moreover, the ALJ's reasons for rejecting Plaintiff's claim of total disability based on her subjective complaints were sufficiently specific to allow this Court to conclude that the ALJ rejected Plaintiff's testimony on largely permissible grounds and not for arbitrary reasons.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is not free of legal error. Therefore, this Court ORDERS that:

1. Plaintiff's social security complaint, Doc. 1, IS GRANTED;

2. This matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion, to determine whether Plaintiff has the ability to perform her past relevant work, with particular attention to a better informed assessment of Plaintiff's residual functional capacity, which must involve obtaining one or more consultative examinations regarding the status of Plaintiff's current physical impairment(s) and the functional impacts of her current

condition on her ability to perform basic work-related activities; obtaining updated medical information from any and all of Plaintiff's treating medical sources, including the severity of Plaintiff's impairment(s) and how it affects her ability to function; considering the entire record, providing discussion and rationale for conclusions reached concerning the specific limitations resulting from Plaintiff's impairments; providing a rationale regarding the weight the ALJ accords to all the medical opinions/assessments in accordance with 20 CFR 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p; considering the Workers' Compensation Appeals Board permanent disability decision in Plaintiff's case in compliance with the requirements of SSR No. 06-34p; reviewing the continuing viability of the ALJ's previous finding as to the credibility of Plaintiff's subjective complaints in light of any new, revised, or updated medical evidence, addressing that issue according to the guidelines of 20 CFR § 404.1529 and Social Security Ruling 96-7p; and obtaining evidence from a vocational expert to clarify the effect any assessed limitations have on Plaintiff's ability to return to her past relevant work, as necessary, and if the ALJ finds that she cannot, whether Plaintiff can engage in other types of substantial gainful work that exist in significant numbers in the national economy; and

       3. The Clerk of Court is DIRECTED TO ENTER judgment for Plaintiff Domitila Lemus and against Defendant Michael J. Astrue, Commissioner of Social Security, and to close this case.


IT IS SO ORDERED.

Dated:   **March 27, 2009**                             **/s/ Theresa A. Goldner**
                                                 UNITED STATES MAGISTRATE JUDGE